**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 25-1136**

―――――――――

KIMBERLY ANN POLK,

Plaintiff – Appellant,

v.

MONTGOMERY COUNTY PUBLIC SCHOOLS; MONTGOMERY COUNTY
BOARD OF EDUCATION; SHEBRA L. EVANS, in her individual and official
capacities as board members; MONIQUE FELDER, in her individual and official
capacities as board members; LYNNE HARRIS, in her individual and official
capacities as board members; GRACE RIVERA-OVEN, in her individual and
official capacities as board members; KARLA SILVESTRE, in her individual and
official capacities as board members; REBECCA SMONDROWSKI, in her
individual and official capacities as board members; BRENDA WOLFF, in her
individual and official capacities as board members; JULIE YANG, in her
individual and official capacities as board members,

Defendants – Appellees.

―――――――――

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Deborah L. Boardman, District Judge.  (8:24-cv-01487-DLB)

―――――――――

Argued:  October 23, 2025                          Decided:  January 28, 2026

―――――――――

Before WILKINSON, KING, and THACKER, Circuit Judges.

―――――――――

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Thacker
joined.  Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Frederick W. Claybrook, Jr., CLAYBROOK LLC, Washington, D.C., for Appellant.  Cassandra Ann Mitchell, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Appellee. **ON BRIEF:** Robert Flores, GAMMON & GRANGE, P.C., Vienna, Virginia; Steven W. Fitschen, James A. Davids, NATIONAL LEGAL FOUNDATION, Chesapeake, Virginia, for Appellant.  Bruce M. Berman, Julia M. May, Megan O. Gardner, Washington, D.C., Alan Schoenfeld, Emily Barnet, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Appellees.

KING, Circuit Judge:

In this appeal from the District of Maryland, plaintiff Kimberly Ann Polk challenges the district court's January 2025 denial of her motion for a preliminary injunction on, inter alia, two First Amendment claims she pursued against defendant Montgomery County Board of Education (the "Board"), which the court also dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Polk v. Montgomery Cnty. Pub. Schs.*, No. 8:24-cv-01487 (D. Md. Jan. 17, 2025), ECF Nos. 39 & 40 (respectively, the "Opinion" and "Order").[1] Polk, who worked for a time as a substitute teacher for Montgomery County Public Schools, maintains that the Board's duly-adopted Guidelines for Student Gender Identity (hereinafter, the "Guidelines") — which required her to affirm that she would refer to students by their preferred pronouns, and to also affirm that she would not discuss any student's gender identity with the student's parents — contravene her First Amendment rights to the free exercise of religion and free speech. Predicated on those constitutional claims, Polk asserts that she is entitled to a preliminary injunction.

As explained herein, we agree with and adopt the district court's analysis in all respects, as set forth in the Opinion, and we affirm. Specifically, exercising pendent appellate jurisdiction to assess the Rule 12(b)(6) dismissals in this appeal, we conclude that the court properly dismissed Polk's First Amendment claims against the Board for failure to state a claim upon which relief can be granted. And in light of the court's correct

---

[1] We observe that, in addition to the Board, Polk sued seven members of the Board and Montgomery County Public Schools. To that end, the district court dismissed all defendants except the Board, but those dismissals are not before us in the present appeal.

dismissals of those claims, Polk cannot demonstrate any likelihood of success on the merits, such that there can be no issuance of preliminary injunctive relief thereon.

I.

A.

1.

For background, the Board is the democratically elected policy-making body for Montgomery County Public Schools, which is one of the largest educational systems in the United States. The Board's jurisdiction encompasses more than 160,000 students, more than 13,000 teachers, and approximately 3,000 substitute teachers. To that end, the Board is tasked with and responsible for overseeing the implementation of various school policies and procedures, which must otherwise be consistent with Maryland law.

Of relevance, the Board adopted the Guidelines prior to the 2019-20 school year. The Guidelines mandate that school staff members — including teachers and substitute teachers, like Polk — "address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school." *See* J.A. 67.[2] And the Guidelines establish the right of each student to keep gender identity private, including from the student's parents. In that regard, the Guidelines provide, inter alia, as follows:

---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

**Privacy and Disclosure of Information**

- All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

- Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act.

- Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws.

- Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

*Id.* at 66-67 (citation modified).

Furthermore, in order to teach in Montgomery County Public Schools, the substitute teachers are required to complete compliance training, which includes reviewing materials that explain the Guidelines. And beginning with the 2022-23 school year, the Board required all staff members — including the substitute teachers — to affirm that they understood the contents of, and would otherwise comply with, the Guidelines.

2.

According to her complaint, Polk applied to serve as a substitute teacher for the public schools of Montgomery County in early 2020, and she was interviewed for that

5

position in April of 2021. *See Polk v. Montgomery Cnty. Pub. Schs.*, No. 8:24-cv-01487 (D. Md. May 21, 2024), ECF No. 1 (the "Complaint"). The Guidelines were then in effect. In an initial interview, Polk expressed a willingness to substitute teach anywhere in the County her services were needed. After she accepted a substitute teaching position later in 2021, Polk was onboarded in a manner consistent with regulations of Montgomery County Public Schools, which required Polk to review training materials relating to the Guidelines.

During the 2021-22 school year, Polk substituted ten times in eight separate elementary schools throughout Montgomery County, "receiv[ing] uniformly positive reviews and responses concerning her teaching." *See* Complaint ¶ 26. Specifically, Polk substituted in roles that involved preschool, special education, kindergarten, and second through fourth grade classes. Having substituted ten times that year, Polk was eligible for retention as a substitute teacher without having to reapply for the 2022-23 school year. On that score, Polk planned to substitute more frequently during the 2022-23 school year.

As a part of the retention process for the 2022-23 school year, however, Polk was required to review online videos concerning the Board's policies and procedures. One such video concerned the Guidelines. After Polk watched the video, she was "instructed . . . to sign electronically (by clicking a box) an affirmation that she had watched and understood the video and that she would fully adhere to the [G]uidelines." *See* Complaint ¶ 30. But

6

Polk declined to do so on account of her "sincerely held religious beliefs," which are "based on her understanding of her Christian religion and the Holy Bible." *Id.* ¶ 31.[3]

In November 2022, Polk submitted a request for a religious accommodation to the compliance coordinator for Montgomery County Public Schools. Thereafter, Polk and the compliance coordinator discussed by telephone a "possible accommodation" that would be "subject to further . . . approval." *See* Complaint ¶ 33. During that conversation, the compliance coordinator purportedly "informed [Polk] that she would not have to use preferred pronouns," that Polk "would not be required to sign the affirmation," and that she "would be permitted to teach in the elementary schools and preschool special education program but not in the middle or high schools." *Id.* ¶ 33a-d. The coordinator also discussed with Polk a possible accommodation by which "the school would provide her with someone else, like a school administrator, who would be able to provide her with support and to interact instead with [a] student" who "presented gender identity issues," in light of her refusal to comply with and adhere to the Guidelines. *Id.* ¶ 33e.

Less than a month later, in December 2022, the compliance coordinator informed Polk that the requested accommodation had been rejected. As a result, Polk did not substitute teach in Montgomery County during the 2022-23 or 2023-24 school years.

---

[3] Specifically, Polk believes that "she would act unethically if she affirmatively assisted children to present as other than their God-given sex," which "would include lying to children by using pronouns for them that do not match their God-given, biological sex." *See* Complaint ¶ 31a. Polk also believes that "God gave parents the primary responsibility for the care and upbringing of their minor children and it would be unethical for her to hide from parents that their child is transitioning genders at school." *Id.* ¶ 31b.

B.

On May 21, 2024, Polk initiated this lawsuit in Maryland federal court. By her Complaint, Polk alleged three counts against the Board: (1) a claim in Count I under Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e-2(a)(1), for the Board's failure to provide her with a religious accommodation (the "Title VII claim"); (2) a civil rights claim in Count II pursuant 42 U.S.C. § 1983, for the Board contravening her First Amendment right to free speech (the "Free Speech claim"); and (3) another civil rights claim in Count III under § 1983, for the Board violating her First Amendment right to the free exercise of religion (the "Free Exercise claim"). Furthermore, the Complaint sought monetary damages from the Board, along with declaratory and injunctive relief.

Shortly after filing her Complaint, on May 29, 2024, Polk moved for a mandatory preliminary injunction on all claims asserted in the Complaint, pending a final resolution of the district court proceedings. Polk thereby sought — for the duration of the preliminary injunction and until permanent relief might be awarded — to "limit her substitute services to elementary school classrooms with no transitioning students attending them." *See* J.A. 34. Relatedly, Polk sought to "obtain assistance from other [school] personnel promptly if she [had to] engage a transitioning student in a way that would violate her religious beliefs." *Id.* By a responsive submission to Polk's Complaint and her preliminary injunction motion, the Board opposed the injunctive relief that had been requested by Polk. The Board otherwise moved for dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

8

C.

By its Opinion and Order of January 2025, the district court granted the Board's Rule 12(b)(6) motion to dismiss with respect to Polk's Free Exercise and Free Speech claims, declined to dismiss her Title VII claim, and otherwise denied preliminary injunctive relief. As the Opinion reflects, the court considered the Rule 12(b)(6) motion first. And in that analysis, the court took up Polk's claims in reverse order, starting with the Free Exercise claim, then turning to the Free Speech claim, and ending with the Title VII claim.

As to the Free Exercise claim of Count III, the Opinion initially explained that "Polk alleges the Guidelines burden her religious exercise by forcing her to act in violation of her Christian beliefs," and she "objects to the requirements that she address students by pronouns that do not correspond to the sex assigned to them at birth and that she hide from parents that their child is transitioning genders at school." *See* Opinion 10 (citation modified). Applying the framework articulated by the Supreme Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), the district court dismissed the Free Exercise claim, concluding that, although the Complaint alleged a burden on Polk's religious exercise, the Guidelines are a "neutral and generally applicable" policy, which are subject to — and "easily pass" — rational basis review. *Id*. at 20-21.

Next, turning to the Free Speech claim of Count II, the Opinion explained that the Complaint alleges that the Board's actions would unconstitutionally compel Polk to "use children's preferred pronouns even if the pronouns do not correspond to the children's assigned sex at birth," as well as "discuss with parents their child's desire to transition genders." *See* Opinion 21. Against the backdrop of the Supreme Court's 2006 decision in

9

*Garcetti v. Ceballos*, 547 U.S. 410 (2006), the district court dismissed the Free Speech claim, on the ground that "the speech that Polk challenges is part of her official duties as a teacher," such that it is "unprotected by the First Amendment." *Id.* at 33.

Finally, with respect to the Title VII claim of Count I, the Opinion recognized that, although the Board conceded that "Polk has stated a failure-to-accommodate claim," the Board was relying on an affirmative defense "that Polk's proposed accommodation would cause it undue hardship." *See* Opinion 34-35. Emphasizing "that undue hardship is a fact-specific inquiry," the district court resolved to deny a dismissal of the Title VII claim and instead allowed that claim to proceed to discovery. *Id.* at 37 (citation modified).

Only then — after ruling in its Rule 12(b)(6) analysis to dismiss the Free Exercise and Free Speech claims, but to otherwise deny a dismissal of the Title VII claim — did the district court consider Polk's motion for a preliminary injunction. Consequently, the court cabined its preliminary injunction analysis to the Title VII claim only, which it characterized as Polk's "sole remaining claim in the lawsuit." *See* Opinion 38.

To that end, the Opinion denied Polk a preliminary injunction for her failure to show irreparable harm. According to the district court, "[t]he harm caused by the alleged Title VII violation is financial" and "[f]inancial harm generally does not suffice to establish irreparable harm." *See* Opinion 39. Notably, however, the Opinion recognized that "[t]he irreparable harm that Polk relied on in support of her preliminary injunction motion was the alleged violation of her constitutional rights." *Id*. But the Opinion reasoned that "now that her constitutional claims [of Counts II and III] have been dismissed, Polk cannot establish irreparable harm" to support an award of injunctive relief. *Id.*

10

The accompanying Order entered by the district court specified that Polk's Free Exercise and Free Speech claims "are DISMISSED," and that the Board's motion to dismiss the Title VII claim "is DENIED." *See* Order 1. The Order then summarily stated that "Polk's motion for a preliminary injunction is DENIED." *Id.*

## II.

In February 2025, Polk timely noted this interlocutory appeal from the district court's Opinion and Order, invoking 28 U.S.C. § 1292(a)(1), which confers jurisdiction to the courts of appeals when, inter alia, an injunction has been denied.[4] For its part, the Board's appellate brief does not contain a "jurisdictional statement," so we are entitled to assume that, on the issue of our jurisdiction, the Board is satisfied with Polk's assessment thereof. *See* Fed. R. App. P. 28(b)(1) (providing that, "unless the appellee is dissatisfied with the appellant's statement," appellee's brief may omit "the jurisdictional statement").

## A.

Despite the parties' agreement on the purported basis of our jurisdiction in this appeal to address the merits of Polk's Free Exercise and Free Speech claims, we are always obliged to independently satisfy ourselves of jurisdiction in order to exercise it. *See, e.g.,*

---

[4] 28 U.S.C. § 1292(a)(1) provides, in pertinent part, that "the courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions[.]" *See* 28 U.S.C. § 1292(a)(1).

11

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  And this situation presents an interesting jurisdictional question that the parties have failed to acknowledge.

Specifically, the jurisdictional issue arises from Polk's appellate contention that the district court erred in denying a preliminary injunction as to the Free Speech and Free Exercise claims, as alleged in Counts II and III of the Complaint.  To be sure, although Polk invokes our jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), she does not fairly challenge the propriety of the court's denial of a preliminary injunction as to her Title VII claim.  Otherwise, the court limited its analysis in that respect to the Title VII claim only, having resolved to allow that claim to proceed to discovery, but to otherwise dismiss the Free Exercise and Free Speech claims pursuant to Rule 12(b)(6).  *See* Opinion 38 (resolving that, with Title VII claim only, and absent Free Exercise and Free Speech claims, Polk could not show irreparable harm necessary for preliminary injunction).

With the foregoing in mind, it is clear that the district court has — if not explicitly — denied Polk the preliminary injunction being sought on the Free Speech and Free Exercise claims.  But in the context of this § 1292(a)(1) appeal from the denial of a preliminary injunction on the Title VII claim only, we cannot accord Polk such relief unless we first assess the court's Rule 12(b)(6) dismissal of the Free Speech and Free Exercise claims.  Indeed, it would do no good for us to conclude that Polk is entitled to a preliminary injunction on the Free Exercise and Free Speech claims without first reinstating them.

That distills the jurisdictional question to just this:  Do we possess jurisdiction to review the district court's Rule 12(b)(6) merits-based dismissals of the Free Speech and Free Exercise claims, even though Count I — that is, the Title VII claim — remains viable

12

in the underlying litigation?  We are satisfied to answer that question in the affirmative. Stated succinctly, we are content to exercise pendent appellate jurisdiction and review the court's Rule 12(b)(6) dismissals of the Free Exercise and Free Speech claims.

B.

To explain our exercise of pendent appellate jurisdiction, some table setting is warranted.  Generally, under 28 U.S.C. § 1291, "[w]e lack jurisdiction to review a district court's order unless it is a 'final' judgment, which means that the order has resolved all claims as to all parties."  *See McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 406 n.6 (4th Cir. 2022) (citation modified).  But here, where we possess jurisdiction pursuant to § 1292(a)(1) to review the denial of the preliminary injunction sought by Polk, we may otherwise exercise pendent appellate jurisdiction to also review the Rule 12(b)(6) dismissals of the Free Exercise and Free Speech claims, so long as those dismissals are "inextricably intertwined with" and "necessary to ensure meaningful review of" the district court's denial of injunctive relief.  *See Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006) (citing, inter alia, *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)).

In that regard, our Court has long recognized that pendent appellate jurisdiction is a "judicially-created, discretionary exception to the final judgment requirement."  *See Rux*, 461 F.3d at 475.  That is, when an issue is already properly before a court of appeals, "[p]endent appellate jurisdiction permits appellate courts to 'retain the discretion to review issues that are not otherwise subject to immediate appeal when such issues are so interconnected with immediately appealable issues that they warrant concurrent review.'" *See Nero v. Mosby*, 890 F.3d 106, 123 (4th Cir. 2018) (citing *Rux*, 461 F.3d at 475).

13

Though pendent appellate jurisdiction should only be exercised sparingly, our Court has recognized that it may be utilized in two distinct situations: "(1) when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of an immediately appealable issue." *See Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013) (citation modified); *see also Swint*, 514 U.S. at 49-50 (cautioning against "a rule loosely allowing pendent appellate jurisdiction").[5]

Although "[p]endent appellate jurisdiction is an exception of *limited* and *narrow application* driven by considerations of need, rather than of efficiency," *see Rux*, 461 F.3d at 475 (emphasis added), we are satisfied that these circumstances compel the exercise of

---

[5] As to the first situation identified above, separate issues are deemed to be "inextricably intertwined" when "the same specific question will underlie both the appealable and the non-appealable order, such that resolution of the question will necessarily resolve the appeals from both orders at once." *See Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 167 (4th Cir. 2023) (citation modified); *see also Altman v. City of High Point, N.C.*, 330 F.3d 194, 207 n.10 (4th Cir. 2003) (determining that resolution of whether officers were entitled to qualified immunity was "inextricably intertwined" with whether municipality could be held liable because the immunity issue "fully resolve[d]" the municipality's liability). We have thus exercised pendent appellate jurisdiction when an earlier, non-immediately appealable order "is inextricably linked to the outcome of the" appealable issue. *See Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 615 (4th Cir. 2001).

Meanwhile, an issue is "necessary to ensure meaningful review if resolution of the appealable issue necessarily resolves the non-appealable issue or where review of the non-appealable issue is necessary to ensure meaningful review of the appealable one." *See Scott*, 733 F.3d at 111 (citation modified). Our Court has utilized this alternative when the orders at issue have been "so interconnected" that they had to be reviewed concurrently. *See Elegant Massage, LLC v. State Farm Mut. Auto. Inc. Co.*, 95 F.4th 181, 188-89 (4th Cir. 2024) (exercising pendent appellate jurisdiction over non-appealable order because "threshold merits question" addressed therein was "integral" to ruling in appealable order).

14

such discretionary jurisdiction. And that is so because the Opinion's Rule 12(b)(6) dismissals of Polk's Free Exercise and Free Speech claims are "inextricably intertwined with" and "necessary to ensure meaningful review of" the court's denial of preliminary injunctive relief, to the extent that Polk sought — and is seeking — such relief on those constitutional claims. *Id.*; *Swint*, 514 U.S. at 42. Put differently, an award of preliminary injunctive relief in Polk's favor — predicated, at her urging, on the now-dismissed Free Exercise and Free Speech claims — would necessitate reinstatement of either of those claims. *See, e.g.*, *Arc of Cal. v. Douglas*, 757 F.3d 975, 992-94 (9th Cir. 2014) (exercising pendent appellate jurisdiction over dismissal under Rule 12(b)(6) where district court ordered dismissal "for the selfsame reason" that it denied preliminary injunction).

### III.

Having established our jurisdictional footing, we turn now to an assessment of whether the district court properly dismissed the Free Exercise and Free Speech claims pursuant to Rule 12(b)(6). In so doing, we assess de novo the dismissal of each claim, accepting the Complaint's factual allegations as true and otherwise viewing them in the light most favorable to Polk. *See Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024).[6]

---

[6] Like the district court, we are satisfied to consider the Board's Guidelines in assessing the propriety of a dismissal under Rule 12(b)(6), which was among the preliminary injunction evidence of both parties and which are otherwise "integral to and explicitly relied on in" the Complaint. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) ("Consideration of a document attached to a motion to dismiss ordinarily is permitted only when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." (Continued)

15

Put simply, we are satisfied that the district court properly dismissed the Free Exercise and Free Speech claims under Rule 12(b)(6). And we agree with and adopt the court's analysis in that respect. We thus affirm the court's dismissal of the constitutional claims and conclude that Polk cannot be awarded a preliminary injunction thereon.[7]

### A.

As the district court initially dismissed Polk's Free Exercise claim of Count III, we begin our Rule 12(b)(6) analysis with her appellate contention that the Guidelines violate her First Amendment right to the free exercise of religion. It has long been recognized by the Supreme Court that "[t]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *See Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) (citation modified).

### 1.

Right out of the gate, Polk maintains that the Supreme Court's *Smith* decision of 1990 — which established the neutral, generally applicable analytical framework applied by the district court — is not the correct framework to apply here. Specifically, Polk asserts

---

(citation modified)). We do not, however, consider other preliminary injunction evidence that falls outside the allowable scope of a Rule 12(b)(6) analysis.

[7] We once again observe that, as to the Title VII claim alleged in Count I of the Complaint — that is, the only live claim left in this litigation — Polk does not appear to challenge the district court's denial of injunctive relief on that claim, despite invoking our appellate jurisdiction under 28 U.S.C. § 1292(a)(1). Nor does the Board challenge the court's refusal to dismiss that claim. As such, our analysis begins — and ends — with a Rule 12(b)(6) assessment of Polk's Free Exercise and Free Speech claims.

that the *Smith* precedent "is a punch-drunk fighter, already counted out by a majority of the sitting Supreme Court justices." *See* Br. of Appellant 7. But even if we were to agree with Polk that *Smith* is a "punch-drunk fighter," we would be duty-bound to faithfully apply that precedent, unless and until the Supreme Court delivers the knockout blow. *See, e.g., United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014) ("[W]e may not disregard [Supreme Court precedent] unless and until the Supreme Court holds to the contrary.").[8]

2.

Having disposed of Polk's threshold contention regarding *Smith*'s applicability, we turn to next the merits of her Free Exercise claim. To establish such a claim, the Supreme Court has recognized that a plaintiff must show that a government entity "has burdened [her] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Smith*, 494 U.S. at 879-81). If a plaintiff can make such a showing, we are obliged to "find a First Amendment violation unless the government can satisfy 'strict scrutiny.'" *Id.*

---

[8] Contrary to Polk's position concerning *Smith*, the Supreme Court recently had an opportunity to overrule that precedent but did not do so. *See Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025). Instead, it reaffirmed the proposition that, "[u]nder our precedents, the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable. *Id.* And the *Smith* precedent thus remains in full force "in most circumstances." *Id.* Although the *Smith* decision may have been narrowed by *Mahmoud*, it was only narrowed in those instances "[w]hen the burden imposed is of the same character as that imposed in *Yoder*." *Id.* That is, *Smith* does not apply when the state "'substantially interfere[es] with the religious development' of [a] parent's children." *Id.* at 565. (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). Notably, Polk is not a parent — she is a substitute teacher. And she has no standing to assert parental rights. Put succinctly, we agree that the *Smith* precedent supplies the framework for our Rule 12(b)(6) assessment of Polk's Free Exercise claim.

17

Notably, however, if the policies are "neutral" and "generally applicable," they are "subject only to rational basis review, 'even where [they have] the incidental effect of burdening religious exercise.'" *See Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022) (quoting *Smith*, 494 U.S. at 879). Under rational basis review, a challenged policy will survive constitutional muster so long as it is "rationally related to a legitimate government purpose." *See Bethel World Outreach Ministries v. Montgomery Cnty. Couns.*, 706 F.3d 548, 561 (4th Cir. 2013) (citation modified).

a.

With the foregoing in mind, Polk must — to succeed on her Free Exercise claim — first establish that the Guidelines burden her sincerely held religious beliefs. *See United States v. Lee*, 455 U.S. 252, 256-57 (1982). To that end, the Supreme Court has observed that pressure from a governmental policy to change or modify one's actions, which would otherwise violate a person's sincerely held religious beliefs, qualifies as a cognizable burden. *See Thomas v. Rev. Bd of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981).

In this light, we agree with the district court's determination that the Complaint plausibly alleges a religious burden. To be sure, Polk believes that gender is rigid, based on her understanding of Christianity. And referring to her students by a gender that is not consistent with the student's gender assigned at birth places a requirement on Polk, that she says is at odds with her faith. As explained in the Opinion, "[b]ecause Polk will not comply with the Guidelines, [the Board] will not employ her as a substitute teacher." *See* Opinion 11. Accordingly, the Complaint has alleged a religious burden on Polk.

18

b.

Yet despite the foregoing, not all burdens are unconstitutional. *See Lee*, 455 U.S. at 259.  As such, we must determine whether the Guidelines are "neutral."  On that score, our Court has recognized that a policy is neutral when it "has no object that infringes upon or restricts practices *because* of their religious motivation."  *See Alive Church of the Nazarene v. Prince William Cnty.*, 59 F.4th 92, 108 (4th Cir. 2023) (citation modified). The starting point of the neutrality inquiry is the text of the challenged law or policy itself. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  And "the minimum requirement of neutrality is that a law not discriminate on its face."  *Id.*

On the face of the Guidelines, there is no mention of anything about religion.  It therefore makes good sense that the district court determined the Guidelines to be facially neutral. And Polk agrees with that ruling.  *See* Br. of Appellant 11.  We also agree and conclude that — on their face — the Guidelines are neutral.

c.

Importantly, such neutrality does not end our analysis of Polk's Free Exercise claim. And that is so because even a facially neutral law or policy can act as a "covert suppression of particular religious beliefs."  *See Bowen v. Roy*, 476 U.S. 693, 703 (1986) (plurality).  In other words, as we have explained, "when presented with a law that affects religious practice, even if indirectly, a court must look behind the law's text to determine if it was enacted 'because of' and not 'in spite of' its effect on religion."  *See Alive Church of the Nazarene*, 59 F.4th at 108 (citation modified).  Consequently, the central question in reviewing a facially neutral law is to discern the motivation for its implementation, not

19

merely its impact on a specific individual. *See Jesus Christ is the Answer Ministries v. Baltimore Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019). If there are plausible allegations that a facially neutral law was implemented with the object of targeting a religious practice, then the law is not facially neutral. *See Church of Lukumi*, 508 U.S. at 533-36.

Upon reviewing the Complaint, we agree with the district court that Polk failed to allege any conduct or statement by the Board that evinces a "beneath-the-surface" hostility toward those holding particular religious views. Instead, Polk maintains that:

- "It is obvious from the face of the Guidelines and their accompanying intake form that they target parents and teachers who disagree with the idea that students should be encouraged to exhibit as other than their God-given sex";

- "It is just as obvious that those teachers and parents holding traditional beliefs about sexuality of the major U.S. religions (Christianity, Judaism, and Islam) are in the forefront of those who disagree"; and

- "The Guidelines label parents with contrary religious beliefs as 'unsupportive' which results in the Board and its teachers refusing to inform religious parents that their child is exhibiting as the other sex."

*See* Br. of Appellant 11 (citation modified). Distilled to its core, the thrust of Polk's appellate position is that, because persons who hold religious views are those most impacted by the Guidelines, they cannot be deemed "neutral." But that logic turns the well-established neutrality analysis on its head. As the court explained, the Complaint "alleges no facts from which the Court could infer religious animus." *See* Opinion 16. That a certain religious practice is incidentally burdened by the Guidelines is not sufficient. Rather, the Guidelines must be motivated by religious hostility.

To resuscitate her flawed contention regarding the allegedly suppressive purposes of the Guidelines, Polk relies on the Supreme Court's 1993 decision in *Church of Lukumi* for the proposition that "the district court turned a blind eye to the real focus of the Guidelines." *See* Br. of Appellant 11-12 (citing *Church of Lukumi*, 508 U.S. at 534). Yet when properly understood, that decision of the Court actually exposes the defect in Polk's Free Exercise claim. In those proceedings, the plaintiffs demonstrated that an otherwise facially neutral ordinance was enacted to target religious practices, as evinced by the city council's reliance on residents's "concern that certain religions may propose to engage in practices which are inconsistent with public morals." *See Church of Lukumi*, 508 U.S. at 535. Those plaintiffs did so through references to extensive contemporaneous statements made by various city council members referencing the Santeria religion. *Id.* at 541 (plurality). Finally, the *Church of Lukumi* plaintiffs had otherwise established that each ordinance was gerrymandered, such that "almost the only conduct subject to the ordinance is the religious exercise of Santeria church members." *Id.* at 535 (citation modified).

Polk, on the other hand, has made no plausible allegations in the Complaint indicating that the Board's adoption of the Guidelines was motivated by any religious hostility. Instead, Polk maintains that, because religious individuals will be impacted, the Guidelines are not neutral. But that contention skirts the nuance of the issue. That is, because Polk herself is a Christian who believes that there are only two sexes does not mean that all Christians believe the same thing, and that non-Christians inherently believe otherwise. Indeed, there are multiple secular reasons why other persons, regardless of their

21

religious background or creed, could take issue with the Guidelines. In any event, the district court recognized why this contention fails as a matter of law:

> Polk offers no facts from which the court could plausibly infer that the Board created the Guidelines to target teachers who adhere to traditional religious teachings on gender identity or that the Board was hostile towards any religion when it enacted the Guidelines. The Guidelines apply to everyone. Anyone who disagrees with them — for religious, secular, or other reasons — must nevertheless abide by them.

*See* Opinion 15 (citation modified). Put simply, that analysis by the court is correct.

d.

Moving on, we also agree with the district court's well-reasoned ruling that the Guidelines are "generally applicable." To that end, our Court has recognized that a governmental policy "is *not* generally applicable 'if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exceptions.'" *See Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024) (emphasis added) (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534-38 (2021)).

Polk makes two contentions in arguing that the Guidelines are not generally applicable. First, she says that the Board did not require all school staff members to "check the box" to acknowledge compliance with the Guidelines until the 2022-23 school year. Second, she maintains that, because the Board possesses unbridled discretion of "whether and how to discipline . . . [her] if she violated the Guidelines while teaching," the Guidelines are not generally applicable. *See* Br. of Appellant 10. Both contentions fail.

Taking Polk's arguments in turn, we initially recognize that it does not matter when the "check-box" requirement became mandatory. To be sure, the act of checking a box is

22

an affirmation of understanding.  But checking a box (or not) does not relieve a school staff member from their obligation to adhere to the Guidelines.  Simply put, beginning in the 2022-23 school year, every school staff member (including Polk) was required to check the box in order to affirm their commitment to the Guidelines, without exception.

Polk's second contention — that the unbridled discretion in how to impose punishments for a violation of the Guidelines shows a lack of general applicability — is easily rejected.  The relevant inquiry in that respect is whether the Guidelines apply to all staff members equally.  And as the district court correctly recognized in its Opinion,

> [h]ere, no system of individual exemptions exists.  The Board's requirement that teachers comply with the Guidelines applies to every teacher; there is no mechanism for granting exemptions to it.  That the Board may exercise discretion in how it implements the Guidelines with parents and how it disciplines teachers who violate the Guidelines does not alter the fact that all teachers must abide by them.

*See* Opinion 18.  Yet again, the district court's analysis here is correct.[9]

### 3.

Lastly, because the Guidelines are neutral and generally applicable, they need only survive rational basis review.  And policies subject to rational basis review are "presumptively constitutional." *See Alive Church of the Nazarene*, 59 F.4th at 112.  As we have recognized, such an inquiry is not demanding:  "Rational basis review 'requires

---

[9] Polk's terse suggestion that the Guidelines are somehow not neutral because the Board retains discretion in how it punishes violations invites a stark departure from established precedent and ignores the reality of managing our Nation's public schools.  For example, a teacher who fails to comply with the Guidelines by intentionally using an incorrect pronoun should not receive the same punishment as a teacher who mistakenly uses one.  Discretion in rendering punishment is simply a reality of school management.

merely that the law at issue be rationally related to a legitimate government interest.'" *See Canaan Christian Church*, 29 F.4th at 199 (quoting *Bethel World Outreach Ministries*, 706 F.3d at 561). And at the Rule 12(b)(6) dismissal stage, the plaintiff must make sufficient allegations to show that a specific policy lacks a rational basis. *See Kim*, 93 F.4th at 749; *Alive Church of the Nazarene*, 59 F.4th at 112 ("[T]he claimant bears the burden of showing that the law is not rationally related to any legitimate government interest.").

Against this backdrop, we agree with the district court's comprehensive ruling that "Polk has not alleged any facts that would defeat the presumption of [the Guidelines'] validity." *See* Opinion 21. After the Opinion identified the Board's purposes for the Guidelines, it walked through each one.[10] And it thoroughly explained as follows:

> The Board's requirement that teachers address students by their preferred pronouns is rationally related to its obligations under Title IX, which prohibits discrimination against transgender students at school. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020) (finding school board's refusal to let transgender student use bathroom corresponding to his gender identity and update school records to reflect his gender identity violated Title IX). Likewise, the Board's requirement that teachers keep students' gender identities confidential, even from their parents, is rationally related to the Board's goal of supporting and protecting the safety of the students whose parents may object to their decision to transition. *See* [J.A. 66] ("In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict."); *cf. Coal. For TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 887 (4th Cir. 2023) (finding school admissions policy supported by rational basis and explaining that "'federal courts should not lightly

---

[10] The underlying purposes of the Guidelines, as recognized by the district court, are: "(1) protecting student safety and preventing discrimination against students; (2) complying with its obligations under federal law, including Title IX . . . which prohibits discrimination based on gender identity; and (3) hiring staff who will nurture transgender and non-transgender students in equal measure." *See* Opinion 19.

24

interfere with the day-to-day operations of schools,' given that 'school officials are far more intimately involved with running schools' than are judges" (quoting *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013))).  Finally, the requirement that all teachers must abide by the Guidelines is rationally related to the Board's goal of hiring staff who will treat and nurture every student equally.  The Guidelines are rationally related to legitimate government purposes. Polk's allegations do not defeat the Guidelines' "strong presumption of validity."

*See* Opinion 20 (citation modified).[11]  In these circumstances, we agree with and readily adopt the court's analysis.  Stated succinctly, the Guidelines — which are neutral and generally applicable — satisfy the rational basis standard.

*      *      *

At bottom, the district court correctly dismissed Polk's Free Exercise claim of Count III pursuant to Rule 12(b)(6).  And we are satisfied to affirm that dismissal.

B.

Turning to Polk's Free Speech claim in Count II, Polk argues that the Board violated her freedom of speech rights by compelling her to speak in a manner that violates her religious beliefs.  That is, Polk contends that, in order to remain employed as a substitute teacher, the Guidelines require her to use a student's preferred pronoun when that pronoun was not assigned to the child at birth.  Polk also maintains that, in order to keep her job, the Guidelines prevented her from discussing with a student's parents the student's

---

[11] Polk says that the Board's identified interests are "defined overly broadly" and are "too amorphous to be afforded any weight."  *See* Br. of Appellant 33.  And she argues that the Board does not have a legitimate governmental interest in either the pronoun or the confidentiality policies set forth in the Guidelines.  But to reiterate once more, the Guidelines must only survive rational basis review, which they do.

25

pronoun usage or desire to transition genders.  We are constrained to reject each of Polk's contentions and affirm the district court's Rule 12(b)(6) dismissal of her Free Speech claim.

1.

For background, it is well established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *See Connick v. Meyers*, 461 U.S. 138, 142 (1983).  Even so, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  In the context of public-school education, teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (citation modified), but "certain limitations are placed on the free speech rights of schoolteachers . . . due to the nature of their employment by government-operated schools," *see Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007).  And as the Supreme Court has made clear in its *Garcetti* decision of 2006, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *See* 547 U.S. at 418.

Here, the district court correctly identified the three-pronged test that our Court utilizes to determine whether a public employee's First Amendment free speech rights have been violated.  *See* Opinion 21-22 (citing *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017)).  The first prong asks "whether the employee 'was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.'"

26

*See Crouse*, 848 F.3d at 583 (quoting *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). "This prong can be divided into two inquires: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti*, 547 U.S. at 421, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" *See Crouse*, 848 F.3d at 583. (citation modified).

Notably, as our Court has heretofore observed, "if the challenged speech was made as a citizen and addressed a matter of public concern" — then and only then — does the analysis move to the second prong: balancing "the interest of the employee in speaking freely with the interest of the government in providing efficient services." *See Crouse*, 848 F.3d at 583 (quoting *Pickering*, 391 U.S. at 568). Finally, the third prong asks whether the employee's speech caused the alleged adverse action by the employer (i.e., the Board). *Id.*

2.

Against this backdrop of controlling legal principles, we need not wade deep into the weeds because Polk's Free Speech claim fails before she can break out of the gate. Specifically, we agree with the district court that the Guidelines's mandate does not concern the speech of a private citizen, but establishes the official duties of a public-school teacher. More pointedly, how a teacher addresses a particular student in a particular classroom — and whether a teacher communicates with a student's parent — is merely a part of that teacher's job description. *See, e.g.*, *Lee*, 484 F.3d at 695 (explaining that "our school systems are responsible for adequately and properly educating our youth").

To be abundantly sure, the Guidelines do place official requirements on how teachers interact with students and communicate with their parents. And here, those

27

requirements were a part of Polk's official duties as a substitute teacher for Montgomery County's public schools. As carefully explained by the district court in its Opinion,

> [w]hen Polk uses pronouns to refer to students in the classroom setting, she is acting as a teacher, not as a citizen. When Polk speaks to parents about their child's behavior in school, she is acting as a teacher, not a citizen. Such speech is not protected by the First Amendment. Under *Garcetti,* the Board may require Polk to use student-preferred pronouns and may restrict what Polk says to parents about their child's gender identity. Polk may object to the employer-mandated speech on religious grounds, but if she chooses to teach in public schools, she is a government employee and must perform "the tasks she was paid to perform." *Garcetti*, 547 U.S. at 422. Conditioning Polk's employment as a substitute teacher on her agreement to abide by the Guidelines does not violate her right to free speech.

*See* Opinion 24-25. We wholeheartedly agree with and adopt that analysis. *See Garcetti*, 547 U.S. at 421 ("When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

3.

Seeking to forestall the inevitable, Polk maintains that the Supreme Court's 2006 *Garcetti* precedent does not apply here and that, as a result, the district court's Rule 12(b)(6) dismissal of her Free Speech claim was erroneous.[12] But Polk's smattering of *Garcetti*-related contentions fails to move the needle even slightly in her direction.

---

[12] Like the district court, we are satisfied to apply the *Garcetti* precedent instead of the *Pickering-Connick* framework, because the speech involved in this case is not curricular. The Guidelines are administrative requirements placed on Polk by the Board. *See Lee*, 484 F.3d at 697 (applying *Pickering-Connick* to bulletin board material curricular in nature). But even if we applied the *Pickering-Connick* framework here, Polk would still lose for a simple reason — individual student pronoun preferences are simply not a matter (Continued)

28

Polk's first *Garcetti* contention is that, although the Board may express its own message in the Guidelines, "the Board is requiring that Polk accept and emulate not speech that the Board has commissioned or created, but the pronoun preferences of the students and the students' desire to keep what is happening at school secret from their parents." *See* Br. of Appellant 18 (citation modified). And Polk maintains that she "is being forced to embrace and speak the transgender message of students." *Id.* (citation modified).

That contention is baseless. Indeed, Polk is not challenging a student's right to choose their pronouns. And it is not the students who are forcing her to comply with the Guidelines. Rather, the Board created the Guidelines, and it "has chosen to require teachers to use the child's preferred pronouns," because "[t]he use of preferred pronouns when referring to children in the classroom is the speech of the Board." *See* Opinion 30 n.8. Pursuant to the Guidelines, then, all teachers are required to use the preferred pronouns of the students in classrooms. And if a student comes to school and wishes to be referred to as a specific gender, it does not follow that the student then compels a teacher's speech. Instead, the teacher must adhere to a policy of the Board — i.e., the Guidelines.

Second, Polk maintains that the *Garcetti* precedent does not apply here because she "refuses to recite the speech demanded of her." *See* Br. of Appellant 20. But the decision that Polk relies on to support that contention — that is, *Janus v. AFSCME*, 585 U.S. 878 (2018) — actually bolsters the Board's argument that governmental entities can control

---

of "public concern." *Id.* (recognizing that "because [the teacher's] speech was not a matter of public concern, he possessed no First Amendment protection").

speech made pursuant to an employee's official duties. The *Janus* Court observed that "[o]f course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 908. And "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer. The employee is effectively the employer's spokesperson." *Id.* at 910. In such a light, Polk cannot argue that referring to children by their preferred pronouns and limiting communications between parents and teachers is unlawful. The Guidelines do not contravene Polk's free exercise rights and are otherwise lawful. As such, we are constrained to reject Polk's *Janus* argument regarding *Garcetti*.

Third, Polk asserts that the *Garcetti* precedent does not apply in this situation because the Guidelines "compel[] speech for an illegitimate purpose." *See* Br. of Appellant 23. As Polk sees it, the Board — vis-à-vis the Guidelines — is doing nothing more than "taking a position on a highly contentious matter that is roiling our country, to the extent of making sure its position on the issue gets enforced even when its teachers and parents think that doing so is against the children's best interest." *Id.* at 22.

But we readily decline Polk's invitation to run the public schools. Perhaps our distinguished fallen colleague Judge Widener said it best, writing as follows for our en banc Court over a quarter century ago:

> In the case of a public school . . . it is far better public policy, absent a valid statutory directive on the subject, that the . . . curriculum be *entrusted to the local school authorities* who are in some sense responsible rather than to the school teachers, who would be responsible only to the judges, had they a First Amendment right to participate in the makeup of the curriculum.

30

*See Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998) (en banc) (emphasis added). Be it choosing curriculum or placing administrative requirements on how teachers deliver that curriculum, those decisions are entrusted to the Board, not to judges. And it is the Board — not individual teachers — which is democratically responsive. If, as Polk says, teachers and parents disagree with the Guidelines, then democratic means exist to address their concerns.[13]

---

[13] Polk also offers two additional contentions concerning *Garcetti*, but neither make any sense. For example, Polk contends that the *Garcetti* precedent is inapplicable because the speech required by the Guidelines "is not a part of a teacher's curricular or administrative duties." *See* Br. of Appellant 21. To be sure, Polk is correct that the speech at issue is not curricular. *See, e.g.*, *Boring*, 136 F.3d at 367-68 (recognizing that play selected by teacher was curricular); *Lee*, 484 F.3d at 694 (concluding that religious poster-board material was curricular). And that fact is ultimately of importance. Critically, although the Guidelines do not relate to curricular issues, Polk contends that the Guidelines are not "administrative." But the contention that they are not "administrative" is confounding. Classroom administration — i.e., addressing students and communicating about students to their parents — is a teacher's job. With that being so, the district court did not err in describing the obvious: how Polk addresses her students in the classroom, and how Polk speaks to parents about a student's conduct, flow directly from Polk's employment by the Board. *See* Opinion 24. In other words, the Board can condition a teacher's continued employment on such administrative requirements.

Otherwise, Polk maintains that, because the Guidelines compel speech "in an academic setting," *Garcetti* is of no moment. *See* Br. of Appellant 25. It is true that the *Garcetti* Court expressly declined to decide whether it would extend to situations involving "scholarship or teaching." *See* 547 U.S. at 425. And our Court has since declined to apply the *Garcetti* analysis to university faculty. *See Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023). But as to issues concerning elementary and secondary school teachers — where the challenged acts are administrative and unrelated to curriculum matters — the *Garcetti* precedent applies. Put simply, the Free Speech issue in this appeal relates to a disagreement about classroom management, not academic freedom.

31

4.

We briefly respond to the premise of our dissenting colleague regarding Polk's Free Speech Claim — specifically, that the Board is contravening the First Amendment by "demand[ing] that teachers speak a message supportive of transgenderism by requiring the use of students' preferred pronouns," and that such words are of "public concern." *See post* 35, 39-40. The flaws in that view are twofold. First, our good friend overlooks the proposition that Polk is pursuing only an as-applied challenge to the Guidelines, and not a facial challenge. That is, Polk contests the validity of the Guidelines as they pertain to her conduct inside the classroom. But importantly, how Polk addresses individual students within an early-elementary school classroom — as opposed to public statements outside school regarding the Guidelines — is not a matter of "public concern." Second, the dissent ignores the fact that it was Polk who voluntarily signed up to teach in the elementary schools. And to be sure, no one forced Polk to become a substitute teacher in Montgomery County. Accepting her position as an elementary school substitute teacher subjected Polk to a substantial degree of control by the democratically-elected Board, including that she adhere to the Guidelines. Simply put, if Polk had wished to express her "more socially conservative positions," *see post* 38, there were other avenues available. To rule otherwise would unnecessarily authorize the judiciary to "interfere with the effective operation" of the schools in Montgomery County. *See Janus*, 585 U.S. 908.

32

*　　*　　*

At bottom, we are of opinion that the district court properly dismissed Polk's Free Exercise and Free Speech claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. And because those constitutional claims fail on the merits, Polk could not and cannot be entitled to an award of preliminary injunctive relief thereon. That is, Polk failed to demonstrate a "likelihood of success on the merits" as to those claims, which precludes an award of preliminary injunctive relief in her favor. *See Winter v. Nat. Res. Def. Couns. v. Winter*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest." (citation modified)); *see also Henderson for NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (recognizing that failure to establish any *Winter* factor is fatal to request for preliminary injunctive relief).

IV.

Pursuant to the foregoing, we affirm the dismissal of Counts II and III of Polk's Complaint, for failure to state a claim upon which relief can be granted. As a result, there is no basis for injunctive relief on either of those First Amendment constitutional claims.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

I would hold that the plaintiff, Ms. Kimberly Polk, is likely to succeed on the merits of her free-speech claim. Montgomery County Public Schools ("MCPS") gave Ms. Polk, a substitute teacher, an unjust ultimatum: use transgender students' preferred pronouns in violation of her personal convictions or teach somewhere else. Because MCPS's policy compels speech on a noncurricular matter, and because reasonable alternatives existed (*e.g.*, using only students' last names), I would hold that the *Pickering* balancing test applies and favors Ms. Polk.

In holding instead that the Free Speech Clause does not provide even qualified protection to Ms. Polk's speech, the majority leaves teachers completely vulnerable to becoming the unwilling mouthpieces of government messaging. Although transgender-rights advocates may now cheer the majority opinion, they will find today's cure in truth a poison when states enact legally indistinguishable policies *preventing* teachers from using preferred pronouns in schools. And because nothing prevents school systems from pushing this newfound control much further than mere pronoun usage, I respectfully dissent.

## I.

I agree with the majority that Ms. Polk's Free Exercise Clause claim is unlikely to succeed on the merits. On this issue, the Supreme Court's position in *Employment Division v. Smith*, 494 U.S. 872 (1990), controls. Although some Justices have expressed doubts about that decision's "neutral and generally applicable" formula, the Court has not abrogated it. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 543 (2021) (Barrett, J.,

joined by Kavanaugh, J., concurring); *id.* at 545 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment). We, as circuit court judges, are bound to respect the precedential effect of *Smith* until the Court itself holds otherwise. That is, as they say, elementary.

## II.

I depart, vigorously so, from the majority's free-speech analysis. This case is, without question, about *compelled* speech—a detail to which the majority gives short shrift. This is not a case where a school board is disciplining a teacher for using coarse or bigoted language. No, MCPS seeks to put words in Ms. Polk's mouth. It demands that teachers speak a message supportive of transgenderism by requiring the use of students' preferred pronouns, silence or reasonable alternatives be damned. J.A. 67.

In putting this court's imprimatur on MCPS's policy, the majority disregards our nation's core First Amendment tenets. The Founders held no illusions regarding the danger posed by too much governmental regulation of speech. As early as 1722, Benjamin Franklin, quoting wholesale from Cato's Letters No. 15, railed against the "wretched Countries" that so regulated speech: "[W]here a Man cannot call his Tongue his own, he can scarce call any Thing else his own. Whoever would overthrow the Liberty of a Nation, must begin by subduing the Freeness of Speech." Silence Dogood No. 8 (1722), *reprinted in* 1 THE PAPERS OF BENJAMIN FRANKLIN, JANUARY 6, 1706 THROUGH DECEMBER 31, 1734, at 27–28 (Leonard W. Labaree ed. 1959) (quoting 1 THOMAS GORDON, CATO'S LETTERS 96 (London, 5th ed. 1748)).

35

MCPS insists that there is no abridgment of free speech here. Rather, it says Ms. Polk has chosen not to speak and not to address her students by their preferred pronouns. This makes no difference. Her silence—her refusal to use preferred pronouns—conveys a distinct point of view, which however distasteful to some, remains meaningful to her. Disapproval can be voiced by a quiet refusal to approve. Control of one's tongue is no less important when an individual's desired speech is really the lack thereof. Surely, "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 713 (1977) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Indeed, "since *all* speech inherently involves choices of what to say and what to leave unsaid," freedom of speech necessarily encapsulates the decision to choose "what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 573 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 11, 16 (1986) (plurality opinion)). Again, this reflects our Founders' wisdom. Thomas Jefferson decried "compel[ling] a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors[] [as] sinful and tyrannical." A Bill for Establishing Religious Freedom, *in* 2 THE PAPERS OF THOMAS JEFFERSON 545 (J. Boyd ed. 1950); *see also Janus v. AFSCME, Council 31*, 585 U.S. 878, 905 & n.8 (2018).

It has become a lodestar of our "constitutional constellation" that "no official . . . can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642 (striking down a state law compelling students to say the pledge of

36

allegiance in schools). But this is what MCPS has done. It has stepped right into the classroom and told teachers right down to the last syllable what words to utter and what, in addressing a student, teachers may and may not say. Time and time again, the Supreme Court has extolled the especially egregious nature of compelled speech. In *Wooley v. Maynard*, the Court held that New Hampshire could not force citizens to display the message "Live Free or Die" on their vehicles' license plates. 430 U.S. at 705. In *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, it held that Massachusetts could not alter a parade organizer's speech by requiring the inclusion of an LGBT group. 515 U.S. at 557. And, most recently, in *303 Creative LLC v. Elenis*, the Court held that Colorado could not coerce a graphic designer into making custom wedding websites for same-sex couples. 600 U.S. 570 (2023).

All these cases illustrate that the state has little role in defining the contours of acceptable debate. The First Amendment "foreclose[s] public authority from assuming a guardianship of the public mind." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). MCPS has paid this point no heed. It has given opposing beliefs of transgender rights no quarter. It seeks to place the entire subject beyond even murmurous misgivings, not to mention open debate. We must construe our free-speech doctrines "to invite dispute," not shirk from it, especially when speech may seem undesirable or unpopular. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Ms. Polk's views may indeed be unpopular, but we stand on a dangerous precipice when the government seeks to coopt an individual's voice as a "'billboard' for the State's ideological message." *Wooley*, 430 U.S. at 715; *see also 303 Creative*, 600 U.S. at 586.

37

Just look at the instant case. MCPS has established a hierarchy of public opinion, valuing pro-transgender messages above more socially conservative positions—a paradigmatic example of viewpoint discrimination. But whether speech be "right" or "wrong," we must reject a policy that exists for "no better reason than promoting an approved message or discouraging a disfavored one." *Hurley*, 515 U.S. at 579. Indeed, "[f]orcing free . . . individuals to endorse ideas they find objectionable is always demeaning," *Janus*, 585 U.S. at 893. By all means, voice objections to Ms. Polk's point of view. Say she is insensitive to issues of transgender identity. But do not indulge affronts to speakers' dignity simply because they, like Ms. Polk, stand in the minority. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that [homosexuality] may be embraced and advocated by increasing numbers of people is all the more reason to protect . . . those who wish to voice a different view."); Elena Kagan, *Regulation of Hate Speech and Pornography After* R.A.V., 60 U. CHI. L. REV. 873, 882–83 (1993). "[T]he proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer,* 279 U.S. 644, 655, (1929) (Holmes, J., dissenting)).

The majority places little stock in these principles of neutrality and noninterference. MCPS has required Ms. Polk, a minority-view holder in Montgomery County, to "disseminate" views she does not hold, thereby "'enhanc[ing] the relative voice' of [her] opponents." *Pac. Gas*, 475 U.S. at 14 (quoting *Buckley v. Valeo*, 424 U.S. 1, 49 (1976) (per curiam)). The effects of this compelled, viewpoint-discriminatory speech must loom large

38

when determining whether Ms. Polk, as a public employee, retains First Amendment protection.

### III.

### A.

While in most other contexts we would review compelled, viewpoint-discriminatory speech under strict scrutiny, *see, e.g.*, *Wooley*, 430 U.S. at 716–17, Ms. Polk spoke as a public employee and thus has more limited First Amendment protection, *see Connick v. Myers*, 461 U.S. 138, 143–44 (1983). This caveat does not, however, render the Free Speech Clause inoperable in the workplace. Indeed, just as our compelled-speech doctrine safeguards public debate, the Supreme Court in *Pickering* ensured that teachers like Ms. Polk retain their right as citizens to "comment[] upon matters of public concern." *Pickering v. Bd. of Educ. of Twp. High Sch.*, 391 U.S. 563, 568 (1968).

Determining whether an employee's speech covers a "public concern" is a liberally construed test which asks whether the message touches upon an issue of "political, social, or other . . . community" interest. *Synder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146). There can be no question that transgender rights represent a highly contentious and significant issue in our social and political zeitgeists. *See Darlingh v. Maddaleni*, 142 F.4th 558, 565 (7th Cir. 2025). If this issue is not one of public concern, I cannot think of an issue that would be. Few areas remain untouched by this heated debate. It reaches public accommodations, *e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); sports, *e.g.*, *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th

542 (4th Cir. 2024), *cert. granted sub nom. West Virginia v. B.P.J. ex rel. Jackson*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025) (mem.); health care, *e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025); books, *e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522 (2025); dress codes, *e.g.*, *Texas v. EEOC*, 785 F. Supp. 3d 170 (N.D. Tex. 2025); employment, *e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); passports, *e.g.*, *Trump v. Orr*, No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025) (mem.); and military service, *e.g.*, Exec. Order No. 14183—the list goes on. And many of these substantive issues are intertwined with a secondary, higher-level debate about state interference with parental rights. *See, e.g.*, *Mahmoud*, 606 U.S. at 547.

B.

Because the speech in this case touches upon a matter of public concern, MCPS may prevail only if its interests outweigh Ms. Polk's. This balancing test, established in *Pickering*, begins tilted in an employee's favor where, as here, the speech "substantially" implicates a social or political interest. *Connick*, 461 U.S. at 152. Likewise, the Supreme Court has suggested that the *Pickering* test may require modification in the context of compelled speech, in part to account for the higher level of scrutiny we normally apply to such coercive action. *Janus*, 585 U.S. at 908–09. But the exact formulation of the *Pickering* balancing test need not beleaguer us today. MCPS's preferred-pronoun policy fails the least-demanding version, let alone the most strenuous one.

Ms. Polk's interests in avoiding compelled speech on a topic of significant public dispute are weighty. Moreover, the speech at issue here also runs afoul of Ms. Polk's

40

sincerely held religious convictions. *See* J.A. 24. Religiously motivated speech holds a special place in our constitutional scheme. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[G]overnment suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince."). Indeed, the First Amendment inextricably intertwines free exercise and free speech. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 276–78 (1981); *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021).

On the other side of this equation, MCPS alleged interests in ensuring students' safety and equality. Resp. Br. at 27–28, 50–51. But these laudable goals are not implicated by the actual circumstances at play here. Ms. Polk is not threatening to use biological pronouns or to harass transgender students. She has merely asked for reasonable accommodations that would allow students to *self*-identify however they choose while still respecting Ms. Polk's convictions. Many such alternatives exist, and Ms. Polk referenced some. The most obvious solution would be to permit Ms. Polk to call all students by their last name (*e.g.*, "Bueller, please answer question 43."). In light of this easy "win-win" for teachers and school districts, *Meriwether*, 992 F.3d at 510–11, the result of the interest balancing is as obvious as if MCPS were playing seesaw with a lead block.

## IV.

### A.

The majority bypasses the entirety of *Pickering* balancing by engaging in an impermissibly broad reading of the "official duties" exception in *Garcetti v. Cebalos*, 547

41

U.S. 410, 421 (2006). It suggests that within the four walls of the classroom, and perhaps most of the school building, teachers never speak as private citizens and thus retain no speech protections whatsoever. *See Wood v. Fla. Dep't of Educ.*, 142 F. 4th 1286, 1290–91 (11th Cir. 2025). I see no way to reconcile this restrictive approach with the Supreme Court's longstanding admonition that "teachers [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But the majority all but decrees that the First Amendment and its strictures on compelled speech now evaporate the second a teacher passes through these gates and meets a student.[1]

We have never held, however, that the proper *Garcetti* test is one of but-for causation, *i.e.*, whether the speech "owes its existence to a public employee's professional responsibilities." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 989 (3d Cir. 2014) (rejecting this approach). Indeed, the Supreme Court has been clear that a public employee being "within the office environment" is not by itself "dispositive" under *Garcetti*. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 530 (2022) (internal quotation marks omitted) (quoting *Garcetti*, 547 U.S. at 421). Rightfully so—if the presence of a student or location alone could remove all protection from a teacher's speech, the constant refrain that public employees retain their First Amendment rights would ring hollow. The Constitution

---

[1] The majority notes that Ms. Polk voluntarily signed up to teach in the elementary schools, but so what? People regularly volunteer for employment in a great variety of settings without signing away each and every right they possess.

42

does not tolerate such illusions; free speech cannot "be so circumscribed that it exists in principle but not in fact." *Tinker*, 393 U.S. at 513.

If the majority's reasoning is correct, then there is no limit to the words the state can put in teachers' mouths—teachers become, for all intents and purposes, the state's anointed messengers. Are we now to allow states to mandate that teachers voice opinions contrary to their own without any First Amendment protection whatsoever? Can the state force an Israeli teacher to wear a pro-Palestine pin? Can the state force a Quaker math teacher to start class with a statement expressing her support for U.S. military strikes abroad? Can the state force an atheist teacher to recite the pledge of allegiance with the words "under God"? *But cf., e.g.*, *Russo v. Cent. Sch. Dist. No. 1*, 469 F.2d 623, 630–33 (2d Cir. 1972) (citing *Barnette*'s logic and holding under *Pickering* that a school could not compel teachers to say the pledge of allegiance). Can the state force an independent teacher to profess to students her support for incumbent elected officials? Under the majority's view, the only logical conclusion is yes. The state need not even supply a rationale because *Garcetti* would supposedly place such speech outside the First Amendment's ambit.

The consequences of the majority's view could even bring *Garcetti* into tension with other public-employment precedents, particularly the Supreme Court's political-patronage cases. Before *Garcetti*, the Court made clear that public employers could not condition employment or disciplinary action on membership in or endorsement of a political party or platform. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74–77 (1990); William Baude & Eugene Volokh, *Compelled Subsidies and the First Amendment*, 132 HARV. L. REV. 171, 175–76 (2018) (citing Aaron Tang, *Public Sector Unions, the First Amendment, and*

43

*the Costs of Collective Bargaining*, 91 N.Y.U. L. REV. 144, 152–53 (2016)). *Garcetti* did not even hint at abrogating this doctrine. But it appears the majority would, provided the compelled patronage occurred in the classroom. This cannot be.

B.

None of this is to suggest that *Garcetti* plays no role in public primary and secondary schools. Indeed, boards of education traditionally have broad authority over curricular matters, and *Garcetti* rightly prevents primary and secondary teachers from endlessly second-guessing the government's decisions on what to teach. *See Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370–71 (4th Cir. 1998) (en banc). I would not undo this carveout.

*Garcetti*, however, does not invite compelled speech on the outer perimeter of teachers' core curricular functions. Noncurricular matters, including whether to use preferred pronouns or a student's last name, do not implicate the same need for state control as curricular ones. In this vein, we have often singled out curricular speech as being subject to governmental authority. *See Boring*, 136 F.3d at 370–71; *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 & n.11 (4th Cir. 2007). Indeed, state control of curricular matters is necessary for ensuring educational standards across classrooms. Noncurricular speech, however, is different. *See Boring*, 136 F.3d at 373 (Luttig, J., concurring); *see also Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 741–43 (Va. 2023); *Wood*, 142 F.4th at 1299–1300 (Jordan, J., dissenting). It tends to address the more minor matters endemic to smooth

44

classroom administration, where the need for compelled and viewpoint discriminatory speech is far less salient.

The majority acts as if any narrower interpretation of *Garcetti* would completely gut school systems' authority, enabling a slippery slope into chaotic classroom disruption. Not so. Indeed, I would not so hinder the ability of school boards to ensure effective learning environments. *See Connick*, 461 U.S. at 151 (emphasizing the need to avoid disruptions to workplace efficiency). Rather, I would merely subject compelled speech on noncurricular matters to the *Pickering* balancing test we have used for over half a century—a test which *Garcetti* sought to clarify, not render obsolete.

That test is hardly unfavorable to the government. Under *Pickering*, if the government proffers substantial interests that outweigh those of the teacher, there is no reason why it could not implement a given policy. Indeed, the government has often come out on top of the balance. *See, e.g.*, *Billioni v. Bryant*, 998 F.3d 572, 579 (4th Cir. 2021); *Borzilleri v. Mosby*, 874 F.3d 187, 194 (4th Cir. 2017); *Darlingh*, 142 F.4th at 565; *Heim v. Daniel*, 81 F.4th 212, 234 (2d Cir. 2023).

To reiterate, my qualm with the majority is simply that we cannot categorically write all in-class speech out of the First Amendment. *Garcetti* has its place, but chiefly with regard to core curricular functions. Speech at the noncurricular margins of a teacher's job should remain subject to the same standards that we have always applied. This is no jurisprudential revolution.

V.

45

Ms. Polk's case is one of many plaguing our nation's educational system. Across all levels of education—elementary to college—LGBT rights, DEI, antisemitism, systemic racism, and innumerable other issues have made our schools hotbeds of vehement sociopolitical debate. Silencing voices and compelling affirmations to government-preferred messaging do nothing to temper the vitriol; on the contrary, such actions foster further hostility. Our democratic project relies on the assurance that "state-operated schools may not be enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. It relies on governments fostering viewpoint diversity in the schoolhouse. Students must learn to challenge and debate topics in a respectful, civil manner, but this learning cannot occur if access to ideas, even government-disfavored ones, is not preserved.

I would enjoin MCPS's policy as applied to Ms. Polk. It is a gross assault upon the First Amendment. The resolution of the difficult issues surrounding transgender rights should not come at the expense of our constitutional heritage. Supporters of transgender rights may proclaim the majority opinion a great victory. But the frenzy of battle often renders the zealous warrior heedless of a fight's impending cost. Sadly, those costs will land heavily and impermissibly upon transgender individuals. The majority's decision will prevent a handful of teachers from using reasonable alternatives to preferred pronouns while permitting entire states to ban preferred-pronoun use altogether. *See, e.g.*, TEX. EDUC. CODE § 11.401; FLA. STAT. § 1000.071(3). There is no joy in a fleeting victory, one that will redound not only to the defendants' ultimate detriment, but to the detriment of all those who value free dialogue and unfettered learning within our cherished schools. With all respect to my friends in the majority, I dissent.

46